UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KELLY J. HESSE,

                              Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                        10-CV-421S

DOLGENCORP OF NEW YORK, INC.,
a/k/a DOLLAR GENERAL
CORPORATION,
                              Defendant.


## I. INTRODUCTION

Plaintiff Kelly J. Hesse ("Plaintiff") commenced this action on May 18, 2010 alleging

that Dolgencorp of New York, Inc., a/k/a Dollar General Corporation ("Dollar General" or

"Defendant") discriminated against her based on her sex, pregnancy, and pregnancy-

related disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000e et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§

290 et seq. (Docket No. 1.) Specifically, Plaintiff claims that Dollar General subjected her

to a hostile work environment, demoted her, denied her light-duty work, and terminated her

employment due to her pregnancy. (Compl. ¶¶ 60-76.)

Defendant has filed a Motion for Summary Judgment (Docket No. 46) seeking

dismissal of the Complaint on the following grounds: (1) Plaintiff cannot establish that she

was subject to a hostile work environment due to her pregnancy; (2) Plaintiff's Title VII

claim stemming from her demotion is time-barred; (3) Plaintiff cannot establish a *prima*

*facie* case for her NYSHRL demotion claim; (4) Plaintiff cannot establish that Dollar

General's explanation for demoting Plaintiff was pretextual; (5) Plaintiff cannot establish

a *prima facie* case for her pregnancy discrimination claim stemming from Dollar General's denial of light-duty work and subsequent termination; and (6) Plaintiff cannot establish that Defendant's explanation for not offering her light-duty and terminating her employment is pretextual.[1]  (Def. Mem. 2-25.)

For the following reasons, Defendant's motion is granted in part and denied in part.


## II. BACKGROUND

### A.    Facts[2]

### 1.    Business and Organization of Dollar General

Dollar General is a retailer of basic consumable goods, such as home cleaning supplies, health, beauty aides, food and snacks, pet food and supplies, housewares, lawn and garden tools, toys, and basic apparel. Defendant operates Dollar General stores in New York, which are organized into districts. During Plaintiff's employment, Plaintiff's stores, Nos. 9592 ("Fillmore Store") and 8393 ("Nunda Store" ) were located in District 451. During the course of her employment, Plaintiff also traveled to and worked at other stores within District 451. (Pl. Ex. A ("Hesse Aff."), ¶ 24.)

Each Dollar General Store operates under the direction and supervision of a Store

---

[1] In support of its Motion, Defendant has filed a Local Rule 56(a) Statement of Material Facts (Docket No. 46), Memorandum of Law (Docket No. 47), and appended Exhibits A-L (Docket No. 48). In opposition, Plaintiff has filed An attorney Affidavit, a Local Rule 56(a) Counterstatement of Disputed Facts, Memorandum of Law (Docket No. 53), and appended Exhibits A-MM. (Docket Nos. 54-56).

[2] The following facts are undisputed unless otherwise noted.  The Court has disregarded any assertions or counter-assertions of fact which are not supported by admissible evidence or a valid citation. See Loc. R. Civ. P. 56(a)(3); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (noting that Local Rule 56  should be interpreted to provide that "where there are no[ ] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion").

Manager. Dollar General stores are also staffed with "non-exempt" employees, including one or more Assistant Store Managers, a Lead Sales Associate or Lead Clerk, and several Sales Associates or Clerks. (Def. Ex. J ("Tilton Decl."), ¶ 4.) Plaintiff states that the Fillmore store had three Assistant Store Managers, including herself and a man named Brad Gayford, who was hired eight days after Plaintiff advised her District Manager that she was pregnant and eventually replaced Plaintiff after she took leave six weeks later.  (Hesse Aff. ¶¶ 32, 35; Pl. Ex. E ("Beardsley Dep.") 67-71.)

The ability to frequently lift 40 pounds, and occasionally lift up to 55 pounds, is an essential function of all retail store positions. (Def. Ex. K ("Cherry Decl.") ¶19 & Ex. 5.) Plaintiff denies that this is an essential function, and states that Dollar General and/or District Manager Rhonda Tilton ("Tilton") would selectively determine when the lifting requirements applied. For example, Plaintiff claims that Tilton hired a woman named Anita Christensen, knowing that she could not lift 40 pounds without reasonable accommodations.  (Pl. Ex. F; Beardsley Dep. 223-27.)

### 2.    Plaintiff's Employment History

On April 13, 2005, Plaintiff was hired as a Clerk at the Nunda Store by Tilton,  a Manager at the Fillmore Store. Approximately five months later, Plaintiff was promoted to Assistant Store Manager at the Nunda location. In January, 2006, Tilton promoted Plaintiff again to Store Manager. At that time, Tilton served as Distirct Manager for District 451 and was Plaintiff's direct supervisor. Tilton was aware that Plaintiff already had a child at the time she hired Plaintiff in April, 2005, and when she promoted Plaintiff in January, 2006.

Shortly after Plaintiff's promotion to Store Manager, she attended Dollar General's two-week Store Manager training session in Lockport, New York. There, she received

3

training in Dollar General's policies and procedures prohibiting discrimination on the basis of sex, pregnancy, childbirth, and related medical conditions. As Store Manager, Plaintiff was responsible for adhering to and enforcing Dollar General's anti-discrimination policies.

During Plaintiff's tenure as Store Manager, she struggled to keep her store's overall conditions up to Dollar General's standards. Tilton repeatedly raised concerns about Plaintiff's performance with her**.** Those concerns included that Plaintiff was not holding her employees accountable for their performance, not properly delegating work tasks, failure to ensure that the store was properly recovered, cleaned, and overall store conditions kept up to par. Tilton verbally counseled Plaintiff regarding these issues prior to August, 2006. (Def. Ex. A ("Hesse Dep.") 54-57.) Plaintiff specifically denies that she testified that Tilton had "verbally counseled" her regarding these issues before August, 2006, but admits that Tilton did "discuss" them with her on multiple occassions. (Id.) Verbal counseling, according to Plaintiff, is the first level of formal counseling prior to termination and requires documentation on the Progressive Counseling Record form with dates, times, and main points of the conversation. (Hesse Aff. ¶¶ 16-17; Pl. Ex. M.)

On August 8, 2006, Tilton visited Plaintiff's store and observed ongoing conditions that caused her to issue a written counseling (second level of Progressive Discipline) to Plaintiff. Tilton wrote up Plaintiff for the following infractions: failing to properly train, teach, and hold employees accountable; and unacceptable store conditions, including the store being dirty, not properly recovered, and not merchandised according to the planner.

Tilton met with Plaintiff on August 8, 2006, to inform her of the unacceptable conditions and let her know that she was going to issue Plaintiff a written counseling. The written counseling was prepared on August 11, 2006, and issued to Plaintiff on August 25,

4

2006. Plaintiff was advised by Tilton that she would be issued a final counseling if she failed to correct the issues identified in the written counseling. (Hesse Dep. 49-50, 57 & Ex. 8). Plaintiff states that Tilton immediately issued the written counseling (second level) without completing the verbal counseling (first level) of the Progressive Discipline Policy, and never advised Plaintiff that she was going to issue the written counseling. (Hesse Aff. ¶¶16-17, Pl. Ex. G ("Tilton Dep.") 328; Pl. Exs. M, N, O.)

On or about August 25, 2006, Tilton returned to Plaintiff's store and reviewed with Plaintiff the issues documented in the written counseling. According to Defendant, the problems outlined therein were not addressed and had not improved at the time of her visit. When Plaintiff received this progressive counseling, she understood that her position of Store Manager was in jeopardy and if she did not improve the conditions of her store she would not be able to continue with Dollar General in that capacity. (Hesse Dep. 50, 54, 57.) Plaintiff disagrees that the problems Tilton previously brought up were not addressed. She states that while certain issues had not been resolved, the merchandising had been improved and that she was holding her employees more accountable. (Hesse Aff. ¶ 20.) Plaintiff further states that the Nunda Store was in poor condition when she became Store Manager, and that despite its problems, Plaintiff's store was still meeting sales goals. (Id., ¶¶ 20-21.) She notes that her Annual Performance Review for the year 2006 was rated as "meets expectations" for store cleanliness by Tilton. (Pl. Ex. P.)

Plaintiff alleges that in late August, 2006, after Tilton began counseling her regarding her performance problems, Tilton asked her if she was planning to have any more children, and Plaintiff responded that she was. This conversation was part of a group discussion among four women. (Hesse Dep. 83.) Plaintiff felt that the question was

inappropriate, unusual, and made her feel uncomfortable. (Hesse Aff. ¶ 15.) Tilton never said anything negative or derogatory about Plaintiff's desire to have more children in the future, and Plaintiff was not pregnant at the time this conversation took place. Further, Plaintiff did not report the conversation to Dollar General's Employee Response Center or to anyone else at Dollar General. However, she states she felt intimated and afraid to report the matter.  (Hesse Aff. ¶ 15.)

The conditions of Plaintiff's store did not improve, and TIlton placed Plaintiff on final counseling (third level of Progressive Discipline) as a result. On October 18, 2006, Tilton informed her supervisor, Brian Obrist ("Obrist") that Plaintiff's store failed an audit. Following the results of the audit, Tilton met with Plaintiff and all of the employees at the Nunda Store to discuss recovery and improvement of store conditions. Tilton also sent Plaintiff for additional training with another experienced Store Manager. (Hesse Dep. 64; Def. Ex. D ("Tilton Dep.") 375-6 & Ex. 68.) Plaintiff states that Tilton considered her a "hard worker" with "excellent" customer service skills, and that Tilton did not know that Plaintiff was not adequately trained before being "plunked in" as a Store Manager at Nunda. (Pl. Exs. V & O.)

In December of 2006, Plaintiff's store still was not meeting Dollar General standards, and as a result Tilton demoted Plaintiff to Assistant Store Manager at the Fillmore Store. Plaintiff accepted the demotion and testified that, although she was not happy about the transfer, she expressed to Tilton that the Fillmore Store was closer to her home and that was a positive. Plaintiff began working as an Assistant Store Manager at the Fillmore Store on December 9, 2006, reporting to Manager Heather Beardsley ("Beardsley"). Plaintiff's performance as Assistant Manager was very good.

6

Plaintiff was replaced by Patrick Harrison ("Harrison"), a male Store Manager who received a "standard" performance evaluation and was subject to Progressive Counseling for substandard performance after being transferred. (Pl. Ex. HH.)

### 3.      Plaintiff's Participation in the "Alpha Project"

The Alpha Project was a project created by Dollar General to identify and liquidate aged merchandise and to assist in the process of closing certain unproductive stores. In January, 2007, Tilton invited Plaintiff to participate in the Alpha Project. Plaintiff felt that Tilton's invitation indicated that Tilton believed that Plaintiff was a good merchandiser and a hard worker. For the duration of the project, Plaintiff and other Alpha team members traveled to various stores throughout the area to assist with merchandising, which included scanning, stocking, and restocking merchandise.

The Alpha Project lasted through September, 2007. During this time, Plaintiff traveled with the Alpha team to various locations within the district. At the project's conclusion, Plaintiff returned to her Assistant Store Manager position at the Fillmore Store, although Tilton still occasionally asked Plaintiff to assist her at other locations. According to Defendants, Tilton did so because she thought Plaintiff was a good employee and enjoyed working outside of her store. (Beardsley Dep. 215; Hesse Dep. 110; Tilton Dep. 312.) Plaintiff denies that this was the case, and states that Tilton knew she was pregnant at the time she was asked to travel throughout the region from store to store. (Hesse Aff. ¶ 34.)

### 4.      Pregnancy and Lifting Restriction

Plaintiff learned that she was pregnant on or about September 19, 2007, and

notified Tilton shortly thereafter. For approximately two months, Plaintiff continued to perform the essential functions of her job as Assistant Store Manager and also performed occasional special projects with Tilton. Plaintiff states that only eight days after she informed Tilton that she was pregnant, Tilton hired Brad Gayford ("Gayford") as an additional Assistant Manager for the Fillmore Store. No application exists in any Dollar General record indicating that Gayford applied for the Assistant Manager position, although Dollar General required an application for employment. (Tilton Dep. 185-86.)

Plaintiff's doctors characterized her pregnancy as high-risk due to complications that Plaintiff had experienced during her first pregnancy, and Plaintiff informed Tilton of the same. Plaintiff alleges that Tilton suggested to Plaintiff to get a note from her doctor and take leave from employment. (Hesse Dep. 154-55.) Plaintiff also states that Tilton told her the following during a work trip:

> I was making it hard for [Tilton] not to fire me because other people had told her that I was bad mouthing my Store Manager, Heather Beardsley . . . . She also told me that I got paid too much for what I did . . . . Ms. Tilton told me that her options were to fire me or see if my doctor would pull me out of work until I had my baby. After I would deliver my baby, she said she would try to transfer me out of the Fillmore store when I came back to work. [She] also told me that I should not return to work . . . [and] that I should use my one week vacation time, and then try to obtain a leave under the Family Medical Leave Act and disability.

(Id., ¶ 35.)

In November, during a routine doctor's appointment, Plaintiff's physician placed her on a 20 pound lifting restriction. Plaintiff communicated her work restriction to Tilton, and TIlton forwarded the restriction to the leave department at Dollar General. Plaintiff states that she was instructed to request leave under the Family Medical Leave Act ("FMLA"), and

8

that no attempt was made to accommodate her restrictions, unlike other, non-pregnant Dollar General employees. (Hesse Aff. ¶¶ 42, 49, 51.)

### 5.    Requirements and Duties of Assistant Store Manager

Plaintiff's assigned job duties as an Assistant Manager included: assisting with unloading merchandise delivered by trucks and assisting with efficient staging, stocking, and storing of merchandise. The physical requirement of the position also included, *inter alia*, frequent walking and standing, bending, stooping, and kneeling to run the check out station, and proper lifting of up to 40 pounds while occasionally lifting up to 55 pounds.

Plaintiff states that Store Managers had the discretion to schedule employees to perform certain tasks, and that this discretion permitted employees who may be suffering from short-term disability not to perform one or more of these tasks. (Hesse Aff. ¶ 7, Beardsley Dep. 163-64; Tilton Dep. 110-11, 113-14.)

### 6.    Dollar General Stores

Dollar General sells a wide variety of consumer products, including "core" products that are expected to always been available for purchase in a Dollar General Store. Core products were often delivered in bulk or in cases, and could be packaged in cartons or cases weighing over 20 pounds. Such core products include pasta sauce, 12-packs of toilet tissue, canned beans and fruit, powdered sugar, ketchup, spaghetti, soup, and maple syrup. During November, 2007 through March, 2008, trucks made deliveries weighing 14,584 pounds to the Fillmore Store, equaling over seven tons of merchandise. This merchandise moved from the back stockroom where it was delivered to the sales floor by the physical work of store employees.

Working within the store's labor hours, employees must unload merchandise coming in weekly truck deliveries by getting the merchandise from the back stockroom to the sales floor, and placed upon the shelves (stocking). Store employees must also continuously replenish merchandise after it is sold (re-stocking).

These merchandising tasks are ongoing, and pursuant to the directions of the Store Manager, all employees in the store are expected to participate in the stocking and restocking of the store. Thus, every employee, including Assistant Managers, must be able to perform the various physical tasks, including lifting, in order to effectively operate the store within the labor budget.

The Fillmore Store was budgeted for two Assistant Managers; Sandra Gilman worked as an Assistant Manager along with Plaintiff, although Plaintiff was often out on assignment with the Alpha team or working on other projects.

On or about September 1, 2007, Sandra Gilman was promoted to Store Manager and transferred to the Nunda Store. On or about September 28, 2007, Tilton hired Gayford as an Assistant Manager for the Fillmore Store. According to Tilton, she had been recruiting Gayford for several months prior to hiring him, and Tilton thought he would be a good candidate for a future Store Manager position. (Tilton Decl. ¶ 14; Tilton Dep. 181, 186, 208.) Plaintiff states that for a period of time after Gayford was hired on September 28, Sandra Gilman, Plaintiff, and Gayford were all assigned as Assistant Managers to the Fillmore Store. (Beardsley Dep. 275-76.) Plaintiff further avers that Gayford was hired only eight days after she told Tilton of her pregnancy, and, while Tilton claims to have been recruiting Gayford for several months prior to hiring him, no application for employment exists for Gayford in Dollar General's records. (Pl. Ex. GG.)

10

### 7.   Plaintiff's Leave

Due to Plaintiff's physician's order that she not lift anything in excess of 20 pounds, Dollar General provided her with 12  weeks of FMLA leave, from approximately November 24, 2007 through January 30, 2008. (Hesse Dep. 166; Def. Ex. A, Ex. 13.) Plaintiff states, however, that she could have performed her essential job functions with reasonable accommodations. (Hesse Aff. ¶ 43; Pl. Ex. T.)

On or about January 25, 2008, Plaintiff called Dollar General's leave department to inquire about whether she would be able to return to work after the expiration of her FMLA leave. (Hesse Dep. 171.) Upon telling the representative of the leave department that she wanted to return to work, she was advised that if she had work restrictions she would be unable to return and  would be terminated at the end of February because her leave had expired. (Id. 171-72.) Because Plaintiff was unhappy with the leave department's recitation of Dollar General's leave policies, she was referred to the Dollar General Employee Response Center ("ERC"). The ERC told Plaintiff that Obrist, Dollar General's Regional Manager, would contact her to discuss the situation. (Id. 171-173.)

Obrist called Plaintiff on or about January 29, 2008, to discuss with Plaintiff her inquiry about returning to work. At this time, Plaintiff relayed to Obrist that she was still restricted from lifting more than 20 pounds and that she wanted to be able to return to work with such restriction. Obrist reiterated Dollar General's policy to Plaintiff and informed her that she would be unable to return to work under the current lifting restriction. (Def Ex. B ("Obrist Dep.") 261.) Plaintiff claims that she told him that certain other employees  were permitted to work with medical restrictions. (Hesse Aff. ¶ 48.)

On January 31, 2008, Dollar General sent Plaintiff a letter explaining that her FMLA leave had expired, and asked Plaintiff to contact Dollar General within ten days to discuss her ability to return to work.

After Plaintiff's conversation with Obrist, she phoned the ERC again and explained that she was dissatisfied with Obrist's explanation as to why she was unable to return to work. Accordingly, the ERC transferred her to Dollar General's Alternative Dispute Resolution department. A representative there told Plaintiff that Dollar General could provide her an additional four weeks of medical leave after the expiration of her FMLA medical leave. Thereafter, Dollar General granted Plaintiff an additional four weeks of medical leave, to expire on February 29, 2008. Plaintiff understood that if she was not able to return to work without restrictions by that date, her employment may be terminated.

Plaintiff's expected pregnancy due date was May 16, 2008, approximately ten weeks after the expiration date of her leave of absence. It was therefore anticipated that Plaintiff would not be able to return to work at the expiration of her extended leave.

During her medical leave, Plaintiff consulted with her physician, who confirmed that her restrictions would remain in place until she gave birth. Thus, Plaintiff's restrictions were expected to last from November, 2007 through mid-May, 2008., or approximately six months.

On March 4, 2008, Dollar General sent Plaintiff a letter explaining that her medical leave had expired and asked Plaintiff to contact Dollar General within ten days to discuss her ability to return to work. The letter also stated that if Dollar General did not hear from Plaintiff within ten days, the company would process a voluntary resignation of her employment. Plaintiff's understanding of this letter was that she had been terminated on

12

the date her leave expired, which was February 29, 2008. (Hesse Aff. ¶ 56; Pl. Ex. W.)

Defendant states that because Plaintiff was unable to perform the necessary functions of her job at Dollar General, her employment was terminated on March 18, 2008, a date that Plaintiff disputes. (Def. Ex. K ("Cherry Decl.")  ¶ 4; Hesse Aff. ¶ 56.) Plaintiff reiterates that although she was under a medical restriction of lifting no more than 20 pounds, she could have performed her essential job functions with an accommodation rather than being forced to take and exhaust leave time. (Hesse Aff. ¶ 56; Pl. Ex. Q.)

### 8.    Dollar General's Leave Policy

Dollar General's employment leave policies provide eligible employees with up to 12 weeks of FMLA leave. Its employment leave policies further provide a Medical Absence Leave for employees with a serious health condition who are not eligible for or who have exhausted their FMLA leave. Plaintiff received all the medical leave of absence to which she was entitled, 12 weeks under FMLA policies and an additional four weeks under Medical Absence Leave policies–a total of 16 weeks. Plaintiff was terminated approximately 19 weeks after first going out on medical leave, though Plaintiff states her termination was effective on February 29, 2008, which was 16 weeks after she first went on leave. (Cherry Decl. ¶ 4; Hesse Aff. ¶ 56.)

Following the birth of her second child on May 8, 2008, Plaintiff applied for New York State Unemployment Insurance Benefits.  Dollar General, however, had contested her claim for benefits on the basis that she voluntarily resigned from her job. Plaintiff received a letter to that effect dated July 1, 2008. (Hesse Aff. ¶¶ 58-59; Pl. Exs. X &Y.)

Dollar General had previously indicated that if Plaintiff was ready, willing, and able to return to work after the expiration of her leave, she could re-apply to an available

position. (Pl. Ex. U.) On August 7, 2008, Plaintiff wrote a letter to Tilton seeking reinstatement as an Assistant Manager at the Fillmore Store, but did not re-apply to an open position. (Pl. Ex. Z.) Plaintiff states that no one at Dollar General responded to her request. (Hesse Aff. ¶¶ 60-61.) Plaintiff was not reinstated, but claims that Dollar General then re-hired other individuals who were less qualified, including Harrison and Tanya Kircherer, both of whom had previous disciplinary issues. (Pl. Exs. HH & MM.)

Store Managers are expected to contact Dollar General's leave department when an employee makes them aware of medical issues that may prevent the employee from working greater than three days or that prevented the employee from performing one or more of his or her essential job functions. Store Managers are also required to partner with the leave department to determine how to handle work restrictions or requests for leaves of absence to ensure employees receive the leave they are entitled to and ensure that employees are treated consistently. Plaintiff contends that Store Managers used their discretion to determine whether an employee could work even though he or she did not meet certain job requirements. (Beardsley Dep. 163-66; Tilton Dep. 219-220.)

Through Dollar General's Transitional Duty program, employees who are injured on the job are allowed to continue working in a temporary restricted capacity when medically approved by the doctor treating the work-related injury. Conversely, when an employee cannot perform the requisite job functions as a result of a non-work-related injury or condition, Dollar General does not permit the employee to work on restricted duty. Plaintiff, as a supervisory employee, received this information in her Store Manager Training Program (Def. Ex. O.)

Dollar General is self-insured with respect to New York Worker's Compensation

claims and funds the cost of certain wage replacement benefits for qualifying New York employees injured on the job. Thus, qualifying New York employees who are injured on the job are paid by Dollar General during periods of incapacity–whether or not they are working at a Dollar General store.

### 9. Employees under Restrictions

#### a. Vicki Tisdale

Vicki Tisdale was employed as an Assistant Manager at the Nunda Store in January, 2006, when she suffered an on-the-job injury to her foot. She filed a worker's compensation claim related to her injury, and returned to work with restrictions while she recovered.

#### b. Tanya Kircherer

Tanya Kircherer was employed as an Assistant Manager at the Nunda Store when she reported a work-related injury to her back. She filed a worker's compensation claim related to her injury, and returned to work while she recovered.

#### c. Rhonda Tilton

Tilton was employed as a Manager at the Nunda Store when she had separate surgeries on both of her feet. According to Tilton, she did not have any medical or lifting restrictions. (Tilton Dep. 110-11, 113-14.) Defendant states that while Tilton wore one walking boot at a time over a couple of weeks, she was able to perform all of her essential job functions without accommodation. (Def. Stmt. ¶ 42.) Her testimony, however, indicates that she could not recall whether she participated in the unloading of delivery trucks and the stocking of store shelves after her surgeries, and she stated that it was within her

discretion as Store Manager to assign employees to different tasks. (Tilton Dep. 110-11, 113-14.) Tilton further testified that she did not bring in any kind of medical statement from her doctor stating that she was able to return to work following her surgeries because there were no restrictions. (Id. 113.)  This is despite Dollar General's policy that "an employee returning to work from FMLA leave (or any other leave) due to the employee's own serious health condition will be required to submit a release to return to work ("Fitness for Duty") certificate from the employee's health care provider. (Pl. Ex. DD.)

### d.   Scott Rees

Scott Rees ("Rees") worked as a Store Clerk at the Fillmore Store from June, 2007, through March, 2010. Rees has physical limitations from cerebral palsy, in that the left side of his body is weaker than the right, yet Rees still has use of the left side of his body. Rees states that throughout his employment, he was able to perform the physical requirements of his job duties, including lifting, without accommodation, did not have any physician-imposed medical or lifting restrictions, and did not ask for an accommodation. (Beardsley Dep. 125, 259-60; Def. Ex. E ("Rees Decl.") ¶¶ 3,5.) Plaintiff denies that Rees did not receive any accommodations and did not have any physician-imposed restrictions. She states that because of his disability, he had difficulty in performing many of the functions otherwise required of a Store Clerk, including running a cash register, and was slower at his duties than other employees. Plaintiff states she assisted Rees with lifting cartons of product. (Hesse Aff. ¶ 51.) Though Beardsley did not request any physician's statement indicating whether Rees could perform the physical requirements of the job, she testified that she and Tilton discussed his physical limitations, but neither felt that it would be a

problem in performing the requisite job duties. (Beardsley Dep. 117-18, 121-22.)

### e.   Irene Safford

Irene Safford ("Safford") was working as a Sales Clerk at the Fillmore Store when she hurt her back at home and reported her injury to Beardsley. Safford asked Beardsley if she could temporarily be relieved from mopping due to her injury, and Beardsley excused Safford from mopping the floor for approximately one week. During that week, Safford continued to perform all of her other job duties. Safford did not have a physician-imposed lifting restriction.

### f.   Bobbi Jo White

Bobbi Jo White worked at the Fillmore Store as a Sales Clerk for approximately three weeks during 2007. Beardsley testified that Ms. White acknowledged the physical requirements to work as a Sales Clerk and affirmed that she could meet those requirements. According to Defendant, Beardsley was unaware that Ms. White claimed to have any lifting restriction, Ms. White had never asked Beardsley for any accommodations, and never presented Beardsley with a doctor's note regarding any medical or lifting restrictions. To Beardsley's knowledge, Ms. White performed all of the essential functions of her job, including lifting.  (Beardsley Dep. 175-76, 272-73.)  Ms. White never indicated to Dollar General's leave department that she had any restrictions. (Cherry Decl. ¶ 6.) Plaintiff states, however, that she and Beardsley were both aware of Ms. White's medical issues. (Hesse Aff. ¶ 50.) Beardsley's testimony indicates that Ms. White complained about her medical problems, but "she never brought those problems to [Beardsley's] attention, and . . . she always did whatever her job was. She never got excused from anything."

17

(Beardsley Dep. 176.)

### g.   Anita Christensen

Anita Christensen ("Christensen") worked as a Sales Associate at the Nunda Store from August 24 to October 9, 2006. Christensen, on her acknowledgment of the physical requirements to work in a store as part of her new hire paperwork, wrote "Doctor's Notice" next to the requirement of "frequent and proper lifting of up to 40 pounds; occasional lifting up to 55 pounds" and indicated that she could perform "all essential job functions with reasonable accommodations." (Pl. Ex. F.) Tilton denied knowing of Christensen's limitation, and testified that if Christensen's application indicated a work restriction it would be "up to the [corporate] office to determine what this person is referencing regarding . . . essential job functions with accommodation and what the doctor's note was." (Tilton Dep. 226.)

Christensen failed to present any doctor's note or notice regarding any restriction. Rather, Christensen informed Plaintiff, who was at that time her Manager, on October 9, 2006, that she could not lift more than ten pounds.  After consulting with Tilton, her District Manager, Plaintiff informed Christensen that she needed to bring in a doctor's note regarding the restriction, and Christensen failed to do so. In response to receiving notice of Christensen's restriction, Dollar General placed her on medical leave from October 10 through November 7, 2006. Christensen was terminated on November 4, 2006, after failing to return to work at the conclusion of her medical leave of absence.

### 10.   Non-pregnant Employees

Dollar General reviewed requests for leaves of absence and notices of work restriction for its employees in District 451. During discovery, Defendant provided to

Plaintiff information regarding over 100 instances of employees who sought medical leave and/or requested accommodations in response to Plaintiff's Interrogatories No. 8 and 9. These are listed on a prepared chart as "Leave of Absence Events." (Cherry Decl., Ex. 1; Pl. Ex. EE.)

Defendant states that there were a dozen instances where Dollar General became aware of employees with lifting restrictions. (Cherry Decl. ¶ 9.) These instances were identified to Plaintiff in response to Interrogatories Nos. 8 and 9 as Leave of Absence Event Nos. 6, 9, 15, 19, 31, 32, 36, 43, 47, 55, 56, and 57a. Six of the twelve instances of employees having lifting restrictions involved non-pregnant employees (Nos. 15, 32, 43, 47, 56, 57a).

Defendants state that four of the six non-pregnant employees having lifting restrictions returned to work without restrictions. (Cherry Decl. ¶ 14.) One of those employees, identified at Leave of Absence Event No. 57a, was inadvertently permitted to work with a temporary accommodation because the store returned the employee to work without first consulting the leave department. (Cherry Decl., Ex. 1.)

Another employee, identified as Leave of Absence Event No. 29, returned to work 17 days after her leave expired, and she was not terminated despite Dollar General's policy. (Beardsley Dep. 187-89; Pl. Ex. EE.)

Two of the six non-pregnant employees with lifting restrictions did not return to work at the expiration of their leave of absence periods (Nos. 46, 56).

Plaintiff states that Christensen (No. 47), did not have a leave of absence and was permitted by Tilton to work with restrictions from August 25 through October 10, 2006. (Pl. Ex. EE.)

19

Plaintiff also states that the employee identified as No. 46 exceeded Dollar General's allotted leave by 1 week. (Id.)

### 11.    Pregnant Employees

During the time period of January 1, 2005 to December 31, 2008, there were 23 instances of maternity leaves of absence events in District 451. Over half of these employees returned to work following medical leave, including Nos. 9, 19, 21, 23, 30, 34, 36, 37, 40, 51, 69, and 80.

Six of the 12 Leave of Absence Events involving lifting restrictions were pregnant women: Nos. 6, 9, 19, 31, 36, and 55. Three of these six pregnant employees had lifting restrictions that were removed and they returned to work after taking medical leave during their periods of restriction (Nos. 9, 19, 36). (Cherry Decl., Ex. 1.) Plaintiff states, however, that one of these employees (No. 19) returned to work with a lifting restriction of 15 pounds, and was permitted to work with those restrictions for two weeks. (Pl. Ex. EE.) Plainitff also states that the employee identified at No. 36 was out of work under a combined FMLA and medical leave of 35 weeks, despite that Dollar General's policy was to permit only 16 weeks of leave time. (Id.) Plaintiff thus alleges that she was not permitted to work with restrictions nor was she permitted to extend her leave after it expired, unlike other pregnant employees.

Three pregnant employees with lifting restrictions did not return to work following their leaves of absence (Nos. 6, 31, and Plaintiff). Plaintiff states that the employee identified in No. 6 took a leave of absence of 22 weeks, in excess of the 16 weeks allowed by Dollar General. (Pl. Ex. EE.) Likewise, the other employee that did not return to work (No. 31) was provided with an additional two weeks, for a total of 18 weeks of leave. (Id.)

20

## III. DISCUSSION

**A.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.  "An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment."  Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted).  In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000).

The Second Circuit has noted that trial courts should be particularly cautious in deciding whether to grant summary judgment in employment discrimination cases, because the employer's intent is often at issue.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).  However, the Supreme Court more recently has "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)).  In other words, summary judgment can

be appropriate even in the fact-intensive context of discrimination cases.  This is consistent with a principle purpose of the summary judgment rule; "to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

## B.    Hostile Work Environment

In her First Cause of Action of the Complaint, Plaintiff claims that Defendant subjected her to a hostile work environment due to her pregnancy. (Compl. ¶ 61.) Defendant contends that Plaintiff's claim fails as a matter of law. (Def. Mem. 2-3.) The Court agrees.

A plaintiff opposing a motion for summary judgment on a hostile work environment claim must elicit evidence: (1) that discriminatory harassment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

Factors to consider in examining whether a work environment is sufficiently hostile or abusive to support a Title VII claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Leibovitz, 252 F.3d at 188; see also, Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597,

605 (2d Cir. 2006). The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).

Here, Plaintiff does not allege sufficient facts that would demonstrate conduct that is severe or pervasive as required to create an objectively hostile or abusive work environment. Rather, the crux and emphasis of Plaintiff's Complaint is her disparate treatment claim, and she does not identify any severe and pervasive conduct that created a hostile and abusive environment because of her pregnancy. Though she points to a string of incidents (written counseling, demotion, involuntary leave of absence) in support of her hostile work environment claim, such discrete acts do not demonstrate continuous and concerted conduct and thereby cannot constitute a hostile work environment. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile work environment claims are different in kind from discrete [discriminatory] acts . . . [b]ecause their very nature involves repeated conduct . . . ."); Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 157 (2d Cir. 2012) (citing Morgan);

The only other evidence Plaintiff offers is the conversation between her and Tilton during which Tilton asked whether Plaintiff and her husband were planning to have more children. Tilton's inquiry if she was going to have another child is an isolated remark which alone does not connote discrimination and clearly does not meet the threshold of severity or pervasive. Significantly, Plaintiff testified that no one at Dollar General made any other comments to her that were derogatory or offensive toward pregnant women. (Hesse Dep. 163.) Under these circumstances, Plaintiff does not come close to establishing a *prima*

*facie* case of hostile work environment.[3]  See George v. Liverpool, No. 97–CV–1232, 2000 WL 1499342, at *6 (N.D.N.Y. Sept. 29, 2000) ("Absent  extraordinary severity, a plaintiff must show that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.")(internal quotations omitted); compare Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir.1987) ("Because the claimed incidents in the instant case were few in number and occurred over a short period of time, they fail to allege a . . . hostile working environment"), with Brown v. N.Y.S. Dep't of Corr. Servs., 583 F.Supp.2d 404, 416–17 (W.D.N.Y. 2008) (racial slurs, offensive sexual contact, threats, punctured car tires, hard shoves and bumps, thrown metal objects, chain wrapped around neck sufficient to support hostile work environment claim).

Plaintiff's hostile work environment claim merely repeats the allegations of pregnancy discrimination elsewhere in her Complaint and is insufficient as a matter of law for the reasons stated above.  Defendant's motion for summary judgment on this claim is therefore granted.

## C.    Pregnancy Discrimination

The First and Second Causes of Action of Plaintiff's Complaint assert claims of pregnancy discrimination pursuant to Title VII and the NYSHRL when she suffered adverse employment actions (demotion, denial of light-duty work, and termination), and was subject to different terms and conditions of employment than non-pregnant employees. (Compl. ¶¶ 61-63. 71-72.) Defendants move to dismiss Plaintiff's pregnancy discrimination claims

---

[3] Even taken together, Tilton's sole comment coupled with an alleged adverse employment action, do not constitute a hostile work environment. Cf. Richmond v. Gen. Nutrition Ctrs. Inc., No. 08 Civ. 3577, 2011 WL 2493527, at *16 (S.D.N.Y. June 22, 2011) (frequent, highly offensive remarks over long period of time in combination with adverse employment actions sufficient to support hostile work environment claim).

on several grounds. (Def. Mem. 3-24). Plaintiff's claims are discussed in turn below.

### 1.    Legal Standard

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" 42 U.S.C. § 2000e–2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).   Disparate treatment discrimination claims are analyzed using familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).   Claims under the NYSHRL are governed by the same standards and will have the same outcome as claims analyzed under Title VII. See 42 U.S.C. § 2000(e); 29 U.S.C. § 621 et. seq.; Executive Law § 296, et seq.; see also, Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n. 9 (2d Cir.2008) ("We typically treat Title VII and NYSHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").

The Pregnancy Discrimination Act ("PDA"), which is an amendment to Title VII, incorporates "women affected by pregnancy" into the definition of prohibited gender-based discrimination, 42 U.S.C. § 2000e(k), and requires that pregnant employees not be treated differently from other employees. A plaintiff may establish a *prima facie* case of discrimination under the PDA provisions of Title VII by demonstrating: (1) that she was within the protected group; (2) she was qualified for the position at issue; and (3) she suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. See Kerzer v. Kingly, 156 F.3d 396, 401 (2d Cir.1998). "A plaintiff's burden of establishing a *prima facie* case is *de minimis*. The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic." Abdu–Brisson v. Delta Air

25

Lines, Inc., 239 F.3d at 467 (citations and internal quotation marks omitted).

Once the plaintiff presents a *prima facie case*, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's *prima facie* showing "'drops out of the picture,'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)); see Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

Assuming that a plaintiff establishes a *prima facie* case, and that the defendant provides a non-discriminatory reason for the employment action, at the third tier of the McDonnell Douglas test, the plaintiff is required "to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." Abdu–Brisson., 239 F.3d at 470. If the plaintiff succeeds, such evidence may, or may not, establish the additional required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir.2000) (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000)). "The relevant factors . . . include

the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." Id. (internal quotation marks omitted).

**2.  Demotion Claim**

**a.  Timeliness of Plaintiff's Title VII Demotion Claim**

For a Title VII claim arising in New York to be timely, a plaintiff must have filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e-5(e); Harris v. City of N.Y., 186 F.3d 243, 248 n. 2 (2d Cir. 1999).  Here, Defendant argues, and Plaintiff does not dispute, that her EEOC charge was not filed until August 22, 2008, more than 300 days after her December 2006 demotion.  Plaintiff argues, however, that the demotion was only one of multiple, continuing acts of discrimination against her, and therefore this claim should also be considered timely.

"Discrete acts of discrimination, including *demotion* or termination, cannot be the basis for recovery by a plaintiff if they occurred outside the 300 day period." McGrath v. Thomson Reuters, No. 10 Civ. 4944(JSR)(JCF), 2012 WL 2119112, *8 (S.D.N.Y. Apr. 30, 2012) (citing Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004), *aff'd*, 537 F. App'x 1(2d Cir. 2013)). Further, this Court has already concluded that the discrete acts of discrimination alleged here are insufficient to state a prima facie case of a hostile work environment. See Patterson, 375 F.3d at 220 (where one act contributing to a hostile work environment occurs within the statutory period, the entire time period of the hostile work environment may be considered).  Plaintiff's Title VII claim is therefore time-barred to the

extent it is based on her December 2006 demotion.

      **b.**    ***Prima Facie* Case**

Even if the claim had been timely, Defendant correctly argues that Plaintiff has failed to establish a *prima facie* case of discrimination regarding her demotion under either Title VII or NYSHRL.  Defendant argues that this claim fails because: (1) she did not belong to a protected class at the time of her demotion, and (2) she was not qualified and/or not performing her job duties satisfactorily. (Def. Mem. 4-6.)

Under the PDA and NYSHRL, Plaintiff must prove that the employment decision was made "on the basis of pregnancy, childbirth or related medical condition." Shafrir v. Ass'n of Reform Zionists of Am., 998 F.Supp. 355, 363 (S.D.N.Y. 1998). As other courts have noted, pregnancy "differs from most other protected personal attributes in that it is not immutable. While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" Solomen v. Redwood Advisory Co., 183 F.Supp.2d 748, 753 (E.D. Pa. 2002). A woman need not be pregnant at the time of termination to be a member of the PDA's protected class; rather, this determination is made on a case by case basis. See Helmes v. S. Colonie Cent. Sch. Dist., 564 F.Supp.2d 137, 147 (N.D.N.Y. 2008).  For example, courts have found that an employee terminated while pregnant, on maternity leave, or soon after returning from maternity leave, is a member of the protected class. Id. (holding plaintiff to be a member of protected class where she suffered an adverse employment action nine weeks after she returned from maternity leave); see also, Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995) (agreeing plaintiff was a member of the protected class where plaintiff was terminated less than four months after giving

birth); Jones v. Hosp. of Univ. of Pa., No. 03–CV–4938, 2004 WL 1773725, at *3 (E.D. Pa. Aug. 5, 2004) (holding plaintiff terminated two-and-a-half months after giving birth, and one week after returning to work, demonstrated sufficient temporal proximity to be a member of PDA's protected class); Shafrir, 998 F.Supp. at 363 (holding plaintiff to be a member of protected class under PDA "[e]ven though plaintiff was neither pregnant nor ill at the time she was discharged, she had recently given birth and was on maternity leave.").

Whether a female individual may be part of the protected class prior to her pregnancy, however, is an unsettled issue in this Circuit.  Defendants contend that Plaintiff was not a member of the class protected by the PDA because she was demoted 9 months *before* she announced her pregnancy. (Def. Mem. 5-6.) Two district courts outside of this Circuit have held that women who intended to have children at some point in the future were not part of the class protected under the PDA and its analogous state statutes. See Barnowe v. Kaiser Found. Health Plan of the Nw., No. CV 03-1672-BR, 2005 WL 1113855, at *4 (D. Or. May 4, 2005) (plaintiff informed her supervisor that she was "planning on" trying to get pregnant); Panizzi v. City of Chicago Bd. of Ed., No. 07 C 846, 2007 WL 4233755, at *3 (N.D. Ill. Nov. 19, 2007) (finding no Circuit precedent that supported plaintiff's reading of statute to cover female individuals "planning to become pregnant").

Plaintiff, on the other hand, cites to a recent case from a district court within this Circuit, which found that a plaintiff repeatedly discussing her intentions and attempts to become pregnant prior to her termination from employment satisfied her burden of establishing a *prima facie* case. Dantuono v. Davis Vision, Inc., No. 07-CV-2234, 2009 WL 5196151 (E.D.N.Y. Dec. 29, 2009). It is worth noting that the Eastern District analyzed Dantuono's argument not with regard to whether she was part of the protected class, but

whether she was discharged for a discriminatory reason. <u>Dantuono</u>, 2009 WL 5196151, at *6-7. That court also considered the temporal proximity between the plaintiff's announcement that she was trying to become pregnant and her termination (six months), the fact that immediately after she announced her pregnancy, her job description changed to require heavy lifting and bending, and that she was subject to harassment and disparate treatment despite her complaints to human resources. <u>Id.</u> at *8. The plaintiff in <u>Dantuono</u> was, in fact, pregnant at the time of her termination. <u>Id.</u> at *2. The <u>Dantuono</u> case is therefore distinguishable from the instant matter.

This Court's search has not revealed any controlling Second Circuit precedent considering whether a plaintiff who was planning to become pregnant at the time of an adverse employment action could nonetheless be considered a member of the protected class under the PDA and NYSHRL. Because the parameters of what constitutes a protected class for purposes of a pregnancy discrimination suit have not been definitively resolved, this Court assumes, without deciding, that Plaintiff was a member of the class at the time she was demoted.

Next, Defendant argues that Plaintiff fails to meet her burden of establishing a *prima facie* case because she did not perform her job in a satisfactory manner. (Def Mem. 6-7.) While some cases have interpreted the second prong to mean that a plaintiff must demonstrate that before being fired she was "performing [her] duties satisfactorily," <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997), the Second Circuit has clarified the standard by explaining that the difference "between 'qualified for the position' and 'performing satisfactorily' is only a mere variation in terminology." <u>Velez v. SES Operating Corp.</u>, No. 07 Civ. 10946, 2009 WL 3817461 at *8 (S.D.N.Y. Nov. 12, 2009) (quoting

Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001)). Because a plaintiff's burden at this stage is *de minimis*, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." Slattery, 248 F.3d at 91-92.

Though undisputed that Plaintiff was not meeting the expectations of higher-level management at Dollar General, she was nonetheless promoted quickly after she was hired by Defendant in April, 2005, first from Store Clerk to Assistant Manager and then to Store Manager. Plaintiff retained her position as Store Manager for approximately ten months before her demotion in December, 2006. This is sufficient to establish that Plaintiff was qualified for both the Assistant Manager and Store Manager positions for purposes of her *prima facie* case. See Augustin v. Yale Club, 03–CV–1924, 2006 WL 269028973, at *23 (S.D.N.Y. Sept. 15, 2006) (finding that "[d]ue to the fact that [d]efendant hired, promoted, and retained [p]laintiff for a significant period of time, [p]laintiff has sufficiently pled the second prong of her prima facie . . . claim, that she was qualified for the position").

Because Defendant has not disputed the remaining two elements–whether Plaintiff suffered an adverse employment action that occurred under circumstances giving rise to an inference of discriminatory intent–the Court finds that Plaintiff has met the minimal requirements of demonstrating her *prima facie* case of discrimination under the PDA and NYSHRL.

### c.    Non-Discriminatory Reason

Defendant's assertion that Plaintiff was demoted based on poor performance is a legitimate, non-discriminatory reason for her demotion. See Goins v. Bridgeport Hosp., ---

Fed.Appx. ----, 2014 WL 552676 (2d Cir. 2014) (summary order); Herbert v. City of N.Y., 748 F.Supp.2d 225 (S.D.N.Y. 2010);  Chastven v. CIGNA Corp., No. 97 Civ. 6013, 1999 WL 1034753, at *10 (S.D.N.Y. Nov. 12, 1999) (collecting cases holding poor performance and failure to meet sales quota is sufficient nondiscriminatory reason for termination of employment).

### d.    Pretext

Because Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's demotion, Plaintiff "must establish a genuine issue of  material fact . . . as to whether the employer's reason for the adverse action is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." Vazquez v. Southside United Hous. Dev. Fund Corp., No. 06–CV–5997, 2009 WL 2596490, at *8 (E.D.N.Y. Aug. 21, 2009) (quoting Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994)) (emphasis omitted) (internal editing omitted). Direct evidence of discrimination is not necessary, particularly because "proof is seldom available with respect to an employer's mental processes." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000). Therefore, "[s]ummary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." Id.

While Plaintiff claims she was terminated under the pretext of poor performance, she admits throughout her deposition that she was aware of her own deficiencies as a Store Manager at the time of her demotion, that the issues with her performance were discussed with her prior to her notifying Tilton she was trying to have more children, and does not point to any admissible evidence that pregnant employees were treated

disparately at Dollar General.  Rather, the only evidence of pretext Plaintiff submits is that after she was demoted she was replaced by Harrison, a male employee. (Pl. Mem. 20.)[4] Although evidence that  Plaintiff was replaced by a male employee may be sufficient to meet her burden of establishing a *prima facie* case of pregnancy discrimination, such evidence alone is not enough on which a reasonable jury could find that Dollar General's non-discriminatory reason for terminating her employment was pretextual. See Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 317 (2d Cir.1999) (finding that evidence that plaintiff was replaced by a substantially younger employee, while sufficient to meet "her *de minimis* burden of establishing a prima facie case of age discrimination," was insufficient to show pretext, where the record contained no other evidence that the defendant "considered [plaintiffs] age, [the younger employee's] age, or their ages relative to each other," in terminating the plaintiff's employment).

Plaintiff also argues that Harrison was unqualified, stating that Harrison's performance appraisals as Store Manager prior to replacing Plaintiff were "low." (Pl. Mem. 20.) "Pretext may be proven by evidence showing a younger, less-qualified, weaker-performing employee replaced an older employee," Loeb v. Best Buy Co., 537 F.3d 867, 875 (8th Cir. 2008) (age discrimination case), however the evidence on this record indicates that while Harrison ranked below standard in certain categories, his performance appraisal was "standard" in March, 2005 and February, 2006 on a scale that included "Below Standard," "Standard," and "Above Standard." Accordingly, Harrison's overall

---

[4] This also relies on the assumption that Tilton understood Plaintiff's statement that she was trying to have more children as though she would become pregnant sometime in the immediate future.

rankings were not poor, but average.

Plaintiff's similar assertion that after Harrison replaced Plaintiff that he received "multiple verbal and written counseling reports . . . pursuant to the Progressive Discipline policy" is of little probative value as  Harrison's counseling did not begin until January, 2008, one full year after he replaced Plaintiff.[5] Finally, though Plaintiff states that Tilton disregarded the first step of the Progressive Discipline Policy by failing to provide her with verbal counseling prior to written counseling (Pl. Mem. 20), her own testimony indicates that Tilton had repeatedly discussed her performance issues with her. Additionally, Plaintiff's Progressive Counseling record notes in two places that verbal counseling had already occurred. (Hesse Dep., Ex. 8.)

Finally, there can be no issue of fact as to whether Dollar General's reason for Plaintiff's demotion is pretextual because her disciplinary issues pre-dated the conversation between her and Tilton regarding her potential pregnancy. See Forde v. Beth Israel Med. Ctr., 546 F.Supp.2d 142 (S.D.N.Y. 2008) (Employer's proffered reason for terminating employee, that she had continued unsatisfactory work performance, which began months before employer learned that she was pregnant, was not pretext for pregnancy discrimination under Title VII); see also, Riddick v. MAIC, Inc., Civil No. JKS 09–33, 2010 WL 4904681 (D. Md. Nov. 24, 2010) (rejecting plaintiff's argument of pretext where perception of poor performance preceded her pregnancy and leave announcements); but see Colon v. Fashion Inst. of Tech., --- F.Supp.2d ----, 2013 WL 5677047 (S.D.N.Y. 2013)

---

[5] Plaintiff has submitted duplicate copies of Harrison's Progressive Counseling forms stamped with successive bates numbers. As far as the Court can tell, Harrison was counseled on three occasions, in January, October, and November of 2008. (Pl. Ex. HH.)

(finding sufficient evidence of pretext where plaintiff informed her employer of her pregnancy and *subsequently* received negative performance evaluations and was terminated within the same month). A plaintiff attempting to establish pretext "may not prevail by establishing only [falsity], but must prove, in addition, that a motivating reason was discrimination." Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999) (internal quotation marks and citations omitted). Plaintiff has failed to meet her burden. Because she is unable to establish that the allegations of her poor performance are pretext for pregnancy discrimination, her Title VII and NYSHRL claims arising out of her demotion must be dismissed, and Defendant's motion for summary judgment is granted with respect to these claims.

### 3.    Light-duty/Termination Claim

Defendants next move for summary judgment on Plaintiff's remaining claims of pregnancy discrimination on the grounds that: (1) she fails to prove a *prima facie* case; and (2) she does not show pretext regarding Dollar General's legitimate, non-discriminatory business reasons. (Def. Mem. 10-25.)

### a.    *Prima Facie* case

As stated earlier, to establish a *prima facie* case of discrimination, Plaintiff must show: (1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occured under circumstances giving rise to a an inference of discriminatory intent. See Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008).

Defendant argues that Plaintiff fails to meet the second and fourth element of the

*prima facie* test.[6] (Def. Mem. 10-12.)

With regard to whether Plaintiff was qualified for the position of Assistant Store Manager, her own testimony establishes that she was not qualified to perform her Assistant Manager duties of lifting up to 40 pounds regularly and up to 50 pounds occasionally. Not only had her physician not cleared her to do so, she was also placed on a job restriction for the duration of her pregnancy. On this basis, Plaintiff cannot establish a *prima facie* case of discrimination. See Holmes v. United Airlines, Inc., No. 94 CV 3564, 1996 WL 560193 (E.D.N.Y. Jan. 2, 1996) (plaintiff not qualified for purposes of *prima facie* case where could not perform physical requirements of job due to injury); Appel v. Inspire Pharm., Inc., 712 F.Supp.2d 538 (N.D. Tex. 2010) (pregnant employee of pharmaceutical company was not qualified to perform job of territory manager while under medical restrictions placed upon her by her doctor as required to establish *prima facie* case of pregnancy discrimination under Title VII).

In response, Plaintiff argues that Dollar General should have placed her in a light-duty position. (Pl. Mem. 8-9.)  Pursuant to Dollar General policy, light-duty positions are reserved for employees who have suffered on-the-job injuries. Dollar General therefore contends that the Plaintiff was not "qualified" for light-duty and that its decision to deny her request cannot give rise to an inference of unlawful discrimination. (Def. Mem. 10-11.) At the *prima facie* stage, however, a plaintiff must only show that "she was unable to work full-duty and that there was light-duty work available . . . ." Germain v. Cnty. of Suffolk, 07-CV-2523, 2009 WL 1514513, at *5 (E.D.N.Y. May 29, 2009) (citing E.E.O.C. v. Horizon/CMS

---

[6] At the time of her denial of light-duty and termination, Plaintiff was pregnant, and Defendant does not dispute the remaining elements.

Healthcare Corp., 220 F.3d 1184, 1193 (10th Cir. 2000)). This is true irrespective of whether an employer restricts light-duty assignment to employees that suffer on-the-job injuries. Id. Thus, any employer policy articulating such a restriction is not appropriate for review in evaluating a plaintiff's *prima facie* case. Id.; Horizon, 220 F.3d at 1193 ("When an employee's failure to meet objective, employer-imposed criteria is one of the legitimate, non-discriminatory reasons advanced by an employer to dispel the inference of discrimination raised by an employee at the *prima facie* stage, it cannot also be used to defeat the employee's *prima facie* case.") Here, Plaintiff has shown that she was unable to work full-duty and that there was light-duty work available, and therefore she was qualified for light-duty work.

Next Plaintiff must show that she was denied light-duty work under circumstances giving rise to an inference of discriminatory intent, which may be established by showing that she was treated less favorably than her non-pregnant counterparts. Mento v. Potter, No. 08-CV-7451, 2012 WL 1908920, at *9 (W.D.N.Y. May 25, 2012) (citing Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)). "To be successful, the other employees to whom a plaintiff compares herself must be 'similarly situated' in all material respects and must have engaged in comparable conduct for which they were treated differently. Id. (citing Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).

Plaintiff submits that non-pregnant employees with both on-the-job and off-the job injuries or conditions were treated more favorably than her, including Vicki Tisdale, Tanya Kircherer, Bobbie Jo White, Christensen, Rees, Safford, and Tilton .[7] (Pl. Mem. 12- 13.)

_____

[7] The Court need not consider whether the named employees who suffered on-the-job injuries were similarly-situated to Plaintiff. As discussed in this section, Plaintiff has met her burden of stating a

On the outset, Rhonda Tilton, Dollar General's District Manager, cannot be said to be similarly situated to Plaintiff as her superior, see Prescod v. Am. Broad. Co., 1985 WL 430, at *14 (S.D.N.Y. Mar. 19, 1985) ("Supervisors are not similarly situated employees"); see also, Mento, 2012 WL 1908920, at *9 ("Factors relevant to this analysis include whether plaintiff and the comparators shared the same supervisor, were bound to follow the same procedures, and engaged in conduct of comparable seriousness.") (citation omitted), though there is a question of fact as to whether she relieved herself of certain duties while recovering from foot surgery without following Dollar General's established procedures.  (Tilton Dep. 110-11, 113-14.)

Bobbi Jo White was not treated differently. Although Ms. White verbally told Plaintiff she could not lift over 15 pounds, there is no evidence that she could not meet those requirements or that she could not perform all of the lifting duties during her three-week employment at Dollar General. White never provided a doctor's note regarding any medical or lifting restrictions, and there is no evidence that she did not perform the essential duties of her job.  (Beardsley Dep. 175-76, 272-73; Cherry Decl. ¶ 6.)

Christensen notified Tilton in her employment application that she had a doctor's note regarding a lifting restriction, but never provided the same. When Christensen advised Plaintiff, her supervisor, that she could not lift over ten pounds,  she was placed on a medical leave of absence. Christensen did not to return to work and was terminated at the conclusion of her leave.   There is an issue of fact as to whether Christensen was accommodated with light-duty during her employment at Dollar General and therefore as

_____

prima facie case.

38

to whether she was treated more favorably than Plaintiff.  (Hesse Dep. 174-77; Cherry Decl. ¶ 8, Ex. 1 (Leave of Event No. 47).)

In the case of Scott Rees and Irene Safford, fact issues exist as to whether their conditions were accommodated, albeit informally. Rees, who had certain physical effects from cerebral palsy, states in his affidavit that he performed all of the requirements of the job without a need for any accommodation, including lifting duties. (Rees Decl. ¶¶ 3-5.) Plaintiff testified, however, that Rees would request assistance in lifting heavy items. (Hesse Dep. 193-95.)

Likewise, it is undisputed that Safford was relieved from mopping duty for one week due to a back injury sustained off-the-job. (Beardsley Dep. 182. ) Defendant makes much of the fact that Safford's restriction was not limited to lifting, however, drawing all inferences in favor of Plaintiff, as the Court must for purposes of summary judgment practice, a reasonable trier of fact could conclude that an employee that  was unable to mop would also be unable to lift up to 40 pounds–an essential function of the Sales Clerk position. The fact that Safford's accommodation was of short duration is of little consequence as she and Plaintiff were both subject to temporary restrictions. See Ward v. Acme Paper & Supply Co., Inc., 751 F.Supp.2d 801, 805-06 (D. Md. 2010).

Plaintiff has submitted evidence that Rees and Safford may have been treated differently by being given accommodations, and has thus met her *de minimis* burden in stating a *prima facie* case of discrimination.[8]

---

[8] While the evidence presented by Plaintiff is not particularly strong, the role of the Court is not to weigh the evidence on summary judgment, but to determine whether she has submitted enough to create a material issue of fact regarding whether similarly-situated individuals were treated differently.

b.     **Non-discriminatory Reason**

Defendant states that its policy of only permitting individuals who have work-related injuries to perform light-duty work is non-discriminatory. (Def. Mem. 18.) This would be true if its Transitional Duty policy were administered uniformly. See, e.g., Lee v. Healthfirst, Inc., No. 04 Civ. 8787, 2007 WL 634445, at * 12-14 (S.D.N.Y. Mar. 1, 2007) (granting summary judgment where defendant granted and denied salary increases and bonuses consistent with policy guidelines); see also, Germain, 2009 WL 1514513, at *6 (finding defendant met its burden of production at second stage of McDonnell Douglas test where policy was facially neutral and applied "even-handedly to both pregnant and non-pregnant officers who seek light-duty assignments due to non-occupational injuries."). The evidence here, however, suggests otherwise.

Beardsley and Tilton Both testified to incidences where certain employees who were not injured at work were able to work without proper medical documentation of a stated or perceived medical condition or disability, and work with informal accommodations. For example, Beardsley testified that Safford requested that she be excused from certain duties so not to aggravate her back condition, which Beardsley granted as a "common courtesy." (Beardsley Dep. 164.) Another employee was permitted to work with a temporary accommodation (Leave of Absence Event No. 57a) without forwarding her work restrictions to the leave department at Dollar General. (Cherry Decl., Ex. 1.) This is sufficient to raise a material issue of fact. See Ward, 751 F.Supp.2d at 805 (fact issue existed with respect to whether defendant consistently applied policy of only accommodating employees with work-related injuries where one employee was advised to stay home while recovering from a non-work-related injury, another was given a light-

duty assignment without requesting an accommodation, and supervisor testified that he would occasionally accommodate employees injured outside of work on an informal basis.)

Whether the Transitional Duty policy was uniformly applied throughout Dollar General is a material question of fact that cannot be decided at this stage in the proceedings, rendering summary judgment inappropriate. Defendant's motion is therefore denied with respect to Plaintiff's claims of pregnancy discrimination on the basis of her denial of light-duty and subsequent termination from Dollar General at the conclusion of her medical leave.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket No. 46) is granted with respect to Plaintiff's claims of hostile work environment and pregnancy discrimination arising out of her demotion. Its motion is denied with respect to Plaintiff's claims of discriminatory denial of light-duty and termination.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's  Motion for Summary Judgment (Docket No. 46) is GRANTED in part, and DENIED in part.

SO ORDERED.

Dated: March 31, 2014
        Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
